William DiBIASE

v.

UNIVERSAL DESIGN & BUILDERS, INC.

Supreme Judicial Court of Maine.

Argued Nov. 18, 1983.

Decided April 4, 1984.

---

Bernstein, Shur, Sawyer & Nelson, Alan Atkins, William W. Willard, (orally), Andrew J. Bernstein, Portland, for plaintiff.

Ayer, Hodsdon & Austin, Gordon C. Ayer (orally), Kennebunk, for defendant.

Before McKUSICK, C.J., and NICHOLS, ROBERTS, VIOLETTE, GLASSMAN and SCOLNIK, JJ.

NICHOLS, Justice.

The Defendant, Universal Design & Builders, Inc., appeals from an order of the Superior Court, Cumberland County, awarding the Plaintiff, William DiBiase, the return of his deposit money and denying the Defendant's counterclaim seeking damages for breach of contract. That court found that the contract was not enforceable due to mutual mistake. The Plaintiff cross-appeals and seeks review of the court's finding that time was not of the essence of the contract.

We affirm the judgment.

The Plaintiff, as buyer, and the Defendant, as seller, purported to enter into a contract (dated April 20, 1979) for the sale of real estate. The real estate consisted of a subdivision known as "Sunrise Terrace" "being sold as approved by Town of Cape Elizabeth for 23 single family residential house lots." The purchase price was $88,-000, $4,000 of which the Plaintiff paid as an earnest money deposit. The Town demanded that a sum of money be put in escrow, in lieu of posting a bond, to cover the costs of road work and utility work on the subdivision project. The Plaintiff's undertaking of the subdivision project was contingent on his entrance into the performance escrow agreement, which was to be financed by the Sun Savings and Loan Association. .

The contract provided that it was "subject to purchaser being able to confirm that the property is approved for subdivision as per the attached plans, and if the property is not approved as per plans, then the earnest money deposit will be promptly returned to the purchaser." On the day the contract was signed, the Defendant informed the Plaintiff that the Town of Cape Elizabeth Planning Board had given final approval for the subdivision of all 23 lots and that completion of the subdivision plans would be automatic.

The contract further provided that the Plaintiff would have fifteen days after title was cleared to purchase the property; at that time a deed showing merchantable title would be delivered to the Plaintiff. In addition the contract expressly stated that "time is an essential part of this agreement." On November 29, 1979, the Defendant informed the Plaintiff that title had been cleared. The closing was to be held fifteen days later. When they met for closing, however, the Defendant was unable to present signed releases for five of the encumbrances on the property, although these releases had been signed the same morning and delivered to the Plaintiff's attorney's law firm. The Plaintiff refused to conclude the purchase on the grounds (iterated in his complaint) that he was not being presented with marketable title and that the subdivi-

sion was not approved for subdivision per plans.

The Plaintiff sued to recover his deposit, and the Defendant counterclaimed for breach of contract. At the jury-waived trial, on February 1, 1983, evidence of the following additional facts was adduced: The Defendant's principal officer, George King, and its real estate broker, Ted Scontras, informed the Plaintiff, that based on their understanding, the Town of Cape Elizabeth would approve the Plaintiff as the subdivision developer and would give him the same terms as it had the Defendant, including the amount of the required performance escrow agreement. Testimony varied as to the sum the Plaintiff would need to put into escrow under the original understanding between the Town and the Defendant. It may have been $76,000 or $100,000; at most, it was $140,000. It later developed that by November 8–9, 1979, the Town had not given final subdivision approval for all the lots and that it would require the Plaintiff to put at least $175,000 into escrow. The Sun Savings and Loan Association refused to finance more than $129,000 of the escrow agreement. The Town placed on the Plaintiff additional conditions which he had not been led to anticipate.

The Superior Court concluded, in an order dated March 10, 1983, that the contract was unenforceable, because the parties had made a mutual mistake with respect to a material element of the contract—although this issue was not raised in the pleadings. The court entered judgment for the Plaintiff.

The Defendant's first objection to this final order is that the issue of mutual mistake was not properly before the court. The issue was mentioned neither in the initial pleadings, in the pretrial memoranda, nor in the trial court's pre-trial order. As a general rule, the issue would be treated as waived. M.R.Civ.P. 16(a)(3)(H); *Ocean National Bank of Kennebunk v. Odell,* 444 A.2d 422, 424 (Me.1982). However, M.R. Civ.P. 15(b) provides that "[w]hen issues not raised by the pleadings are tried by . . . implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." This rule generally obtains even where the issue is omitted from a pre-trial order. See *Mains v. United States,* 508 F.2d 1251· (6th Cir.1975); 3 *Moore's Federal Practice* ¶ 15.13[1] (1983).

There is authority for the proposition that an issue is tried by implied consent when one party generates it during the trial and the opposing party does not object to it at the time. *Doane v. Pine State Volkswagen, Inc.,* 377 A.2d 481, 484 n. 2 (Me. 1977); *Gallegos v. Stokes,* 593 F.2d 372, 375 (10th Cir.1979). *But cf. Cushman v. Perkins,* 245 A.2d 846 (Me.1968). When both parties acknowledge an unpleaded issue during trial, implied consent is indisputable. 1 Field, McKusick & Wroth, *Maine Civil Practice* § 15.5 at 304 (1970). Midway in this trial, the presiding justice put the parties on notice that he considered the fundamental issue in the case to be the Plaintiff's understanding at the time of contract as to the preconditions for completing the subdivision. During the remainder of the trial, both sides focused principally on both the Plaintiff's *and* the Defendant's understanding of these preconditions.[1] Both par-

1. Illustratively, the following exchange took place between the Plaintiff's counsel and George King, the Defendant's principal officer:
Q. Wasn't that deal for about $100,000 with Sun Savings? Isn't that what the escrow agreement said?
A. My escrow agreement was for $40,000 and the second agreement was for 100 and some odd thousand.

On redirect examination, this exchange occurred between the Defendant's counsel and King:
Q. Now, under the escrow agreement you've testified it was $40,000 for Section 1?
A. Right.
Q. And how much money was to be provided in the form of an escrow agreement for Section 2?
A. I thought it was 100 and—I don't remember. I thought it was 100 and something, but

ties thereby acknowledged the issue that the understanding of these preconditions may have been mistaken and that the mistake may have been mutual. Hence, the issue of mutual mistake was tried by implied consent.

■ The Defendant next contends that the trial court erred in finding mutual mistake as to a material element of the contract. It protests that there was no mistake on its part, for it "knew what the terms of the contract were, and knew what the various conditions and escrow requirements relating to the subdivision were." The trial court, however, found that the Defendant was mistaken in believing that once the Plaintiff entered into the contract, he would be automatically approved by the Town for the subdivision project and would receive the same escrow terms. This finding may not be disturbed unless it was clearly erroneous. *Blackmer v. Williams,* 437 A.2d 858 (Me.1981). There was ample, credible evidence to support the court's findings. For instance, George King testified, in a passage quoted in the court's final order:

> . . . We had our escrow set up and they'd just automatically say go ahead, as long as everything was good.
>
> THE COURT: And that's what you told him [the Plaintiff]?
>
> THE WITNESS: Yes, yes.

In addition, King admitted that he had told the Plaintiff that he would be able to get the same deal as the Defendant regarding the escrow amounts. In fact, the Plaintiff was not automatically allowed to proceed with the project, and the escrow amount was raised substantially.

that paper I just read said 100, but I thought it was over 100.
Q. That isn't out-of-pocket money?
A. No.
Q. That's guaranteed that the bank would pay that if you hadn't made those improvement [sic]?
A. Right.
Q. And you've testified that the bank agreed that to a qualified buyer it would extend that

■ Clearly, there was a mistake of fact. A mistake of fact occurs if the parties entertain a conception of the facts which differs from reality. *Blue Rock Industries v. Raymond International, Inc.,* 325 A.2d 66 (Me.1974). The mistake was mutual. Mutual mistake occurs when the minds of the parties fall prey to the same misconception with regard to the bargain. *Interstate Industrial Uniform Rental Service, Inc. v. Couri Pontiac, Inc.,* 355 A.2d 913 (Me.1976).

A somewhat more difficult issue is whether this mutual mistake concerned a material element of the contract. The only contractual provision to which the mistake could reasonably relate was the condition that the property be "approved for subdivision as per the attached plan." The presiding justice did not find, however, that this phrase was equivalent to "approved for subdivision under the same terms that were approved for the Defendant." In fact, the justice had concluded earlier in the trial that the subdivision had been approved "for all intents and purposes."

It is apparent, therefore, that the justice found that the shared misunderstanding that the same completion terms would be available to the Plaintiff, though not mentioned in the written agreement, formed an implicit basis for entering the contract. In *Couri Pontiac* we have stated that "the mutual mistake must so vitally affect the facts upon which the bargain was struck that the written contract does not express the intent of the parties." 355 A.2d at 918. In that decision, we denied rescission because we found that a somewhat similar mutual mistake related merely to a collateral matter, namely, the propriety or wisdom of entering the contract.

same escrow guarantee or line of credit to that qualified buyer?
A. Right.
Q. To your knowledge was that in fact offered to Mr. DiBiase?
A. To my knowledge it was. The closing was set up so I imagine the bank must have offered him—or he was satisfied with whatever the bank did offer him.

On the other hand, good authority supports the view that mutual mistake even as to a collateral matter may afford ground for rescission, if such mistake affects the parties' understanding of the value of their bargain. *Jeselsohn v. Park Trust Co.*, 241 Mass. 388, 135 N.E. 315 (1922); *Sherwood v. Walker*, 66 Mich. 568, 33 N.W. 919 (1887) (the "Rose 2d of Abalone" case); 13 *Williston on Contracts* § 1570 (3d ed. 1970). As Williston pointed out, it is a "sound principle of justice" that if the parties contracted on the faith that a certain state of facts existed and that assumption proved erroneous, the parties should be relieved from their bargain. Williston, *supra*, § 1544 at 96. Here, the Plaintiff was reasonably led to believe, through a mistake shared with (and communicated to him by) the Defendant, that by contracting to purchase the real estate from the Defendant, he would automatically receive municipal approval to proceed with the subdivision project and he would need to obtain no more financing than the Defendant had been guaranteed. The Town, however, altered the arrangements, making it far more difficult, and perhaps impossible, for the Plaintiff to undertake the project, thus defeating the sole purpose behind the contract. In this circumstance we conclude that it would be unjust to hold the Plaintiff to his contract.

The Defendant argues, finally, that the Plaintiff should not prevail because he somehow "sat on his rights" by not conducting his own investigation soon enough or by not attempting to correct the mistake. The evidence in the record indicates that the Plaintiff did not act unreasonably in the circumstances. The Plaintiff was not previously familiar with the subdivision project; the Defendant purported to tell him everything he should know about it. The most significant departure from the arrangements on which he had been led to rely in April 1979—the increase in the escrow amount—did not occur until November. The Plaintiff attempted to obtain additional financing and was informed by Sun Savings and Loan Association in a letter dated December 13, 1979, that he could obtain no more than $129,000 for the escrow. It was on this very date that the closing was to take place. These facts do not support a defense of laches. *See A.H. Benoit & Co. v. Johnson*, 160 Me. 201, 207, 202 A.2d 1 (1964).

Because we affirm the judgment for the Plaintiff, there is no need to consider the Plaintiff's cross-appeal.

The entry is:

Judgment affirmed.

All concurring.